UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **CRIMINAL NO.** |
| | : | |
| v. | : | |
| | : | **VIOLATION:** |
| **STANDARD CHARTERED BANK** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy to Violate IEEPA)** |
| Defendant. | : | |

## INFORMATION

The United States informs the Court that:

## GENERAL ALLEGATIONS

At all times material to this Information:

1. Defendant Standard Chartered Bank ("SCB") is a financial institution registered and organized under the laws of England and Wales.

2. Defendant SCB was subject to oversight and regulation in the United States by the Board of Governors of the Federal Reserve System.

3. Defendant SCB conducted United States Dollar clearing at SCB's New York branch ("SCB New York").

4. Defendant SCB had branches throughout the world and conducted financial transactions in United States Dollars at and through SCB New York and unaffiliated U.S. financial institutions in New York and elsewhere.

5. From on or about 2001 until 2007, Defendant SCB facilitated United States Dollar transactions for a number of parties, both known and unknown to the United States, consisting of financial institutions and other parties affiliated with Iran, Sudan, Libya, and Burma.

1

6. Over the years, the United States has employed sanctions and embargos with regard to countries, such as Iran, Sudan, Libya, and Burma. Those restrictions arose in response to repeated support by those nations for international terror against the United States and its allies, and with regard to Iran the proliferation of weapons of mass destruction.

7. During some or all of the time period, from on or about 2001 until 2007, financial transactions conducted by wire on behalf of Iranian, Sudanese, Libyan, and Burmese financial institutions and customers were subject to sanctions by the United States.

8. The United States Department of Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, among other things, administers and enforces economic and trade sanctions against certain foreign countries and entities associated with those countries.

9. With regard to financial transactions involving Iran, Sudan, Libya, and Burma, OFAC is responsible for administering regulations against those countries and entities and was at all times applicable here empowered to authorize transactions with these countries and entities through the granting of authorization, in the form of a license.

The International Emergency Economic Powers Act & Iranian Transaction Regulations

10. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. §§ 1701-1706, authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the

authority under the IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

*The Iranian Sanctions*

11. On March 15, 1995, President William J. Clinton issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States" and declaring "a national emergency to deal with that threat."

12. President Clinton followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibit, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the United States or United States persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transhipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, President Clinton issued Executive Order No. 13059 consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The Executive Orders authorized the United States Secretary of the Treasury to promulgate rules and regulations necessary to carry out the Executive Orders. Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"), 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

13. With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the conduct described below.

14. While the ITRs promulgated for Iran prohibited United States Dollar ("USD") transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution. This exemption is commonly known as the "U-turn exemption."

15. The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank. In a relevant part, the ITR provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer . . . is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank . . . to an account held by a domestic bank . . . for a [second] foreign bank which is not an Iranian entity." 31 CFR §560.516(a)(1). That is, a U.S. dollar transaction to or for the benefit of Iran could be routed through the U.S. as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S. offshore bank. These U-turn transactions were only permissible where no U.S. person or entity had

direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of a Specially Designated National, ("SDN")).[1]

16. Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions. As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

*The Sudanese Sanctions*

17. On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively, the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade-and service-related transactions with Sudan by United States persons, including financing, facilitating, or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transaction by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations

---

[1] OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, OFAC targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called "Specially Designated Nationals" or "SDNs."

implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

*The Libyan Sanctions*

18.   On January 7, 1986, President Ronald W. Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. Executive Order No. 12544 followed one day later, which ordered the blocking of all property and interests in property of the Government of Libya. President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

*The Burmese Sanctions*

19.   On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

20.   On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 ("BFDA") to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services

from the United States, or by U.S. persons, wherever located. The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

## COUNT ONE
## CONSPIRACY TO VIOLATE IEEPA
## (18 U.S.C. § 371)

21.  Paragraphs 1 through 20 of the General Allegations are hereby re-alleged as if fully set forth herein.

22.  At various times during the period starting in or about 2001 and ending in 2007, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, Defendant SCB, did willfully and knowingly conspire, confederate and agree with persons, both known and unknown to the United States to commit offenses against the United States, that is, to engage in financial transactions with entities affiliated with Iran, Sudan, Libya, and Burma, in violation of IEEPA, and regulations and embargoes issued thereunder.

23.  A purpose of the conspiracy was to undertake a variety of financial transactions on behalf of financial institutions and other parties affiliated with countries sanctioned by the United States.

24.  A further purpose of the conspiracy was to process payments on behalf of sanctioned customers without reference to the payments' origin.

25.  It was part of the conspiracy that the defendant eliminated payment data that would have revealed the involvement of sanctioned countries and used alternative payment methods to mask the involvement of sanctioned countries.

## OVERT ACTS

26.     In furtherance of the conspiracy and to achieve the objects and purposes thereof, the defendant and co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

(a) SCB London provided specific instructions to its customer, the Central Bank of Iran ("CBI"), to omit its unique SWIFT code in one field of its payment messages and to place SCB London's SWIFT code in another field to conceal the payments' origin.[2] In the instances in which the CBI failed to insert SCB London's SWIFT code in the payment messages, SCB London's payment processing staff did so manually.

(b) In 2004, SCB London opened additional U.S. dollar accounts for five Iranian banks - Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.

(c) SCB London processed payment messages for these Iranian customers in which the incoming message contained SCB London's SWIFT code in field 52 (the ordering institution field), and the SCB London employees replaced the code in the payment messages with a "." in the outgoing message. SCB London also received payment messages from these Iranian customers in which field 52 included a reference to an Iranian bank or was blank, both of which would have automatically populated an

---

[2] SWIFT is the Society for Worldwide Interbank Financial Telecommunications which is the international system to transmit payment messages with other financial institutions around the world, including U.S. correspondent banks. SWIFT messages contain various informational fields. A SWIFT code is a unique reference name identifying each financial institution.

Iranian reference in the outgoing message to the United States. SCB London employees inserted a "." in the outgoing message to the United States.

(d) SCB Dubai conducted Iranian business for both Iranian banks and Iranian corporate customers. To process these transactions, SCB Dubai received incoming payment instructions as either SWIFT payment messages or payment orders. SCB Dubai then typically processed the transactions as cover payments. The first SWIFT message, a MT 103, was a payment message to a non-U.S. bank informing them of an incoming U.S.-dollar payment on behalf of the Iranian customer; the second SWIFT message, a MT 202, was a cover payment sent to SCB New York for processing. The cover payment messages sent to New York did not contain any references to the Iranian origin of the payments.

(e) Although a majority of the payments may have complied with the U-Turn exemption in the ITRs then in effect, SCB employees omitted references to Iran in payment messages sent to the United States to ensure that SCB New York and unaffiliated U.S. financial institutions could not identify the Iranian origin of the transactions.

(f) In addition to the business with Iran, SCB conducted business involving other sanctioned countries, including Libya, Sudan, and Burma, primarily from SCB London and SCB Dubai. Most of these payments were processed using the "cover payment method," which had the effect of removing all references to the sanctioned entities.

All in violation of Title 18, United States Code, Section 371.

RONALD C. MACHEN JR.
UNITED STATES ATTORNEY

12/7/12
DATE

George P. Varghese
Special Assistant United States Attorney
National Security Section

LANNY A. BREUER
ASSISTANT ATTORNEY GENERAL
CRIMINAL DIVISION

12/8/12
DATE

Clay Porter
Trial Attorney
Asset Forfeiture and Money Laundering Section