UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | CRIMINAL NO. 12-cr-262 (JEB) |
| | : | |
| v. | : | |
| | : | **VIOLATION:** |
| **STANDARD CHARTERED BANK,** | : | **18 U.S.C. § 371** |
| | : | **(Conspiracy to Violate International** |
| Defendant. | : | **Emergency Economic Powers Act)** |
| | : | |

## SUPERSEDING INFORMATION

The United States informs the Court that:

## GENERAL ALLEGATIONS

At all times material to this Information:

1. Defendant Standard Chartered Bank ("SCB") was a financial institution registered and organized under the laws of England and Wales with its headquarters in London, England ("SCB London").

2. Defendant SCB was subject to oversight and regulation in the United States by the Board of Governors of the Federal Reserve System, as well as the New York State Department of Financial Services.

3. Defendant SCB conducted U.S. dollar ("USD") clearing at SCB's New York branch ("SCB New York").

4. Defendant SCB had branches throughout the world and conducted financial transactions in USD at and through SCB New York and unaffiliated U.S. financial institutions in New York and elsewhere.

5. Person A worked at SCB's branch office in Dubai ("SCB Dubai") as a Relationship Manager from 2007 through 2014. As a relationship manager, Person A was the main point of

contact between the bank and numerous small and medium enterprise ("SME") companies that were in his or her portfolio. Person A interacted with his or her customers frequently: answering questions, conducting research, and representing the customer's interests to other SCB components (e.g., the foreign exchange desk).

6. Person B worked at SCB Dubai from approximately 2008 to 2014, as a Treasury Sales Manager (i.e., a foreign exchange sales manager). Person B serviced the needs of the SME customers for SCB Dubai, including encouraging and helping to facilitate foreign exchange transactions. Treasury Sales Managers partnered with Relationship Managers to develop customer relationships.

7. Person C was an Iranian national who ordinarily resided in Iran. Person C controlled Company C-1 and Company C-2, both of which conducted their business operations in Iran. Company C-1 was a customer of SCB Dubai from around December 2006 through February 2011. Company C-2 was a customer of SCB Dubai from around February 2011 through September 2011. Both Company C-1 and Company C-2 conducted USD financial transactions through their accounts at SCB Dubai.

8. From in or about 2001 until 2007, Defendant SCB processed USD transactions for a number of parties, both known and unknown to the United States, consisting of financial institutions and other parties affiliated with Iran, Sudan, Libya, and Burma. From in or about 2007 until 2012, Defendant SCB processed USD transactions for a number of parties, both known and unknown to the United States, consisting of SCB customers resident and/or operating in Iran.

9. Over the years, the United States has employed sanctions and embargos with regard to countries, such as Iran, Sudan, Libya, and Burma. Those restrictions arose in response to repeated support by those nations for international terror against the United States and its allies,

and, with regard to Iran, the proliferation of weapons of mass destruction.

10.    During some or all of the time period, from in or about 2001 until 2012, financial transactions conducted through the United States on behalf of Iranian, Sudanese, Libyan, and Burmese financial institutions and customers were subject to sanctions by the United States.

11.    The United States Department of the Treasury, Office of Foreign Assets Control ("OFAC"), which is located in the District of Columbia, among other things, administers and enforces economic and trade sanctions against certain foreign countries and entities associated with those countries.

12.    With regard to financial transactions involving Iran, Sudan, Libya, and Burma, OFAC is responsible for administering regulations regarding those countries and entities and was at all times applicable here empowered to authorize transactions with these countries and entities through the granting of authorization, in the form of a license.

The International Emergency Economic Powers Act and the Regulations Issued Thereunder

13.    The International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-1706 ("IEEPA"), authorized the President of the United States (the "President") to impose economic sanctions on a foreign country in response to an unusual or extraordinary threat to the national security, foreign policy, or economy of the United States when the President declared a national emergency with respect to that threat. Pursuant to the authority under IEEPA, the President and the executive branch have issued orders and regulations governing and prohibiting certain transactions with Iran by U.S. persons or involving U.S.-origin goods.

14.    Pursuant to 50 U.S.C. § 1705, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any license, order, regulation or prohibition issued under IEEPA.

*The Iranian Sanctions*

15. On March 15, 1995, the President issued Executive Order No. 12957, finding that "the actions and policies of the Government of Iran constitute an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States," and declaring "a national emergency to deal with that threat." The President followed this with Executive Order No. 12959, issued on May 6, 1995, which imposed comprehensive trade and financial sanctions on Iran. These sanctions prohibited, among other things, the exportation, re-exportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran of any goods, technology, or services from the U.S. or U.S. persons, wherever located. This includes persons in a third country with knowledge or reason to know that such goods, technology, or services are intended specifically for supply, transshipment, or re-exportation, directly or indirectly, to Iran or the Government of Iran. On August 19, 1997, the President issued Executive Order No. 13059, consolidating and clarifying Executive Order Nos. 12957 and 12959 (collectively, the "Executive Orders"). The most recent continuation of this national emergency was executed on March 12, 2019. 84 Fed. Reg. 9219 (Mar. 13, 2019). Pursuant to this authority, the Secretary of the Treasury promulgated the Iranian Transaction Regulations ("ITRs"),[1] 31 C.F.R. Part 560, implementing the sanctions imposed by the Executive Orders.

16. With the exception of certain exempt transactions, the ITRs prohibit, among other things, U.S. depository institutions from servicing Iranian accounts and directly crediting or debiting Iranian accounts. The ITRs also prohibit transactions by any U.S. person who evades or avoids, has the purpose of evading or avoiding, or attempts to evade or avoid the restrictions imposed under the ITRs. The ITRs were in effect at all times relevant to the conduct described

---

[1] Effective October 22, 2012, the Department of the Treasury renamed and reissued the ITRs as the Iranian Transactions and Sanctions Regulations. All of the conduct at issue herein took place prior to the renaming.

4

below.

17. While the ITRs promulgated for Iran prohibited USD transactions, they contained a specific exemption for USD transactions that did not directly credit or debit a U.S. financial institution. This exemption is commonly known as the "U-turn exemption."

18. The U-turn exemption permitted banks to process Iranian USD transactions that began and ended with a non-U.S. financial institution, but were cleared through a U.S. correspondent bank. In a relevant part, the ITRs provided that U.S. banks were "authorized to process transfers of funds to or from Iran, or for the direct or indirect benefit of persons in Iran or the Government of Iran, if the transfer…is by order of a foreign bank which is not an Iranian entity from its own account in a domestic bank…to an account held by a domestic bank…for a [second] foreign bank which is not an Iranian entity." 31 CFR § 560.516(a)(l). That is, a USD transaction to or for the benefit of Iran could be routed through the U.S. as long as a non-U.S. offshore bank originated the transaction and the transaction terminated with a non-U.S. offshore bank. These U-turn transactions were only permissible where no U.S. person or entity had direct contact with the Iranian bank or customer and were otherwise permissible (e.g., the transactions were not on behalf of a Specially Designated National, ("SDN")).[2]

19. Effective November 10, 2008, OFAC revoked the U-turn exemption for Iranian transactions. As of that date, U.S. depository institutions were no longer authorized to process Iranian U-turn payments.

---

[2] OFAC publishes a list of individuals and companies owned or controlled by, or acting for or on behalf of, OFAC targeted countries. It also lists individuals, groups, and entities, such as terrorists and narcotics traffickers designated under programs that are not country-specific. Collectively, such individuals and companies are called Specially Designated Nationals" or "SDNs."

*The Sudanese Sanctions*

20. On November 3, 1997, President Clinton issued Executive Order No. 13067, which imposed a trade embargo against Sudan and blocked all property and interests in property of the Government of Sudan. President George W. Bush strengthened those sanctions in 2006 pursuant to Executive Order No. 13412 (collectively, the "Sudanese Executive Orders"). The Sudanese Executive Orders prohibited virtually all trade and investment activities between the United States and Sudan, including, but not limited to, broad prohibitions on: (a) the importation into the United States of goods or services from Sudan; (b) the exportation or re-exportation of any goods, technology, or services from the United States or by a United States person to Sudan; and (c) trade- and service-related transactions with Sudan by United States persons, including financing, facilitating, or guaranteeing such transactions. The Sudanese Executive Orders further prohibited "[a]ny transaction by a United States person or within the United States that evades or avoids, has the purposes of evading or avoiding, or attempts to violate any of the prohibitions set forth in [these orders]." With the exception of certain exempt or authorized transactions, OFAC regulations implementing the Sudanese Sanctions generally prohibited the export of services to Sudan from the United States.

*The Libyan Sanctions*

21. On January 7, 1986, President Ronald W. Reagan issued Executive Order No. 12543, which imposed broad economic sanctions against Libya. Executive Order No. 12544 followed one day later, which ordered the blocking of all property and interests in property of the Government of Libya. President George H.W. Bush strengthened those sanctions in 1992 pursuant to Executive Order No. 12801. These sanctions remained in effect until September 22, 2004, when President George W. Bush issued Executive Order No. 13357, which terminated the

national emergency with regard to Libya and revoked the sanction measures imposed by the prior Executive Orders.

*The Burmese Sanctions*

22. On May 20, 1997, President Clinton issued Executive Order No. 13047, which prohibited both new investment in Burma by U.S. persons and U.S. persons' facilitation of new investment in Burma by foreign persons.

23. On July 28, 2003, President George W. Bush signed the Burmese Freedom and Democracy Act of 2003 to restrict the financial resources of Burma's ruling military junta, and issued Executive Order No. 13310, which blocked all property and interest in property of other individuals and entities meeting the criteria set forth in that order. President Bush subsequently issued Executive Order Nos. 13448 and 13464, expanding the list of persons and entities whose property must be blocked. Executive Order No. 13310 also prohibited the importation into the United States of articles that are a product of Burma and the exportation or re-exportation to Burma of financial services from the United States, or by U.S. persons, wherever located. The "exportation or re-exportation of financial services to Burma" is defined to include the transfer of funds, directly or indirectly, from the United States.

## COUNT ONE
## CONSPIRACY TO VIOLATE IEEPA
## (18 U.S.C. § 371)

24. Paragraphs 1 through 23 of the General Allegations are hereby re-alleged as if fully set forth herein.

25. At various times during the period starting in or about 2001 and ending in 2007, the exact dates being unknown to the United States, in the District of Columbia and elsewhere, Defendant SCB, did willfully and knowingly conspire, confederate and agree with persons, both

known and unknown to the United States to commit offenses against the United States, that is, to engage in financial transactions with entities affiliated with Iran, Sudan, Libya, and Burma, in violation of IEEPA, and regulations and embargoes issued thereunder.

26.  A purpose of the conspiracy was to undertake a variety of financial transactions on behalf of financial institutions and other parties affiliated with countries sanctioned by the United States.

27.  A further purpose of the conspiracy was to process payments on behalf of sanctioned customers without reference to the payments' origin.

28.  It was part of the conspiracy that the Defendant eliminated payment data that would have revealed the involvement of sanctioned countries and used alternative payment methods to mask the involvement of sanctioned countries.

## OVERT ACTS

29.  In furtherance of the conspiracy and to achieve the objects and purposes thereof, the Defendant and co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

   a. SCB London provided specific instructions to its customer, the Central Bank of Iran ("CBI"), to omit its unique SWIFT code in one field of its payment messages and to place SCB London's SWIFT code in another field to conceal the payments' origin.[3] In the instances in which the CBI failed to insert SCB London's SWIFT code in the payment messages, SCB London's payment

---

[3] SWIFT is the Society for Worldwide Interbank Financial Telecommunications which is the International system to transmit payment messages with other financial institutions around the world, including U.S. correspondent banks. SWIFT messages contain various informational fields. A SWIFT code is a unique reference name identifying each financial institution.

8

processing staff did so manually.

b. In 2004, SCB London opened additional USD accounts for five Iranian banks - Bank Melli, Bank Sepah, Persia International Bank, Bank Saderat, and Bank Mellat.

c. SCB London processed payment messages for these Iranian customers in which the incoming message contained SCB London's SWIFT code in field 52 (the ordering institution field), and the SCB London employees replaced the code in the payment messages with a "." in the outgoing message. SCB London also received payment messages from these Iranian customers in which field 52 included a reference to an Iranian bank or was blank, both of which would have automatically populated an Iranian reference in the outgoing message to the United States. SCB London employees inserted a "." in the outgoing message to the United States.

d. SCB Dubai conducted Iranian business for both Iranian banks and Iranian corporate customers. To process these transactions, SCB Dubai received incoming payment instructions as either SWIFT payment messages or payment orders. SCB Dubai then typically processed the transactions as cover payments. The first SWIFT message, a MT103, was a payment message to a non-U.S. bank informing them of an incoming USD payment on behalf of the Iranian customer; the second SWIFT message, a MT202, was a cover payment sent to SCB New York for processing. The cover payment messages sent to New York did not contain any references to the Iranian origin of the payments.

e. Although a majority of the payments may have complied with the U-Turn

exemption in the ITRs then in effect, SCB employees omitted references to Iran in payment messages sent to the United States to ensure that SCB New York and unaffiliated U.S. financial institutions could not identify the Iranian origin of the transactions.

f. In addition to the business with Iran, SCB conducted business involving other sanctioned Countries, including Libya, Sudan, and Burma, primarily from SCB London and SCB Dubai. Most of these payments were processed using the "cover payment method," which had the effect of removing all references to the sanctioned entities.

**(Conspiracy to Violate IEEPA, in violation of Title 18, United States Code, Section 371)**

## COUNT TWO
## CONSPIRACY TO VIOLATE IEEPA
## (18 U.S.C. § 371)

30. Paragraphs 1 through 23 of the General Allegations are hereby re-alleged as if fully set forth herein.

31. At various times during the period starting in or about 2007 and ending in or about 2011, in the District of Columbia and elsewhere, Defendant SCB did willfully and knowingly conspire, confederate and agree with persons, both known and unknown to the United States, to commit offenses against the United States, that is, to engage in financial transactions through the United States with entities resident and/or operating in Iran, in violation of IEEPA, and regulations and embargoes issued thereunder.

32. SCB, acting through Persons A and B, willfully conspired with several people and entities to help Iran-connected customers of SCB Dubai conduct USD transactions and to cause United States financial services to be exported to Iran. Persons A and B helped Iranian nationals

located in Dubai open commercial bank accounts at SCB Dubai, with knowledge that in some instances the commercial bank accounts were fronts for Iranian businesses. Persons A and B also helped Iranian nationals operating such accounts to conduct USD financial transactions and to facilitate the transfer of USDs to Iranian entities. Persons A and B engaged in this conduct in the scope of their employment with SCB, and their intent was, at least in part, to generate revenue for SCB and to maintain their employment with SCB Dubai.

33. One of the Iran-connected customers of SCB Dubai was Person C, who operated business accounts on behalf of Company C-1 and Company C-2. Person A was the relationship manager for Person C's business accounts from approximately 2007 through 2011. Person B helped facilitate foreign currency transactions, including in USDs, for Person C's business accounts from approximately 2008 through 2011. Person A and Person B both knew that Person C's business organizations operated from Iran and conducted USD transactions for the benefit of Iranian entities. At no time did SCB or its co-conspirators apply for, receive, or possess a license or authorization from OFAC for USD financial transactions on behalf of Company C-1 and Company C-2.

## **OVERT ACTS**

34. In furtherance of the conspiracy and to achieve the objects and purposes thereof, the Defendant and its co-conspirators, both known and unknown to the United States, committed and caused to be committed, in the District of Columbia and elsewhere, the following overt acts, among others:

    a. Between in or about November 2007 and August 2011, Person A and Person B counseled Person C on ways to structure financial transactions that would not raise suspicion of an Iran connection or other illegality.

  b. Between in or about November 2007 and August 2011, Person A and Person B provided false and misleading information in order to disguise the Iranian connections of Person C and his companies. When other financial institutions rejected payment requests from SCB on behalf of Company C-1 and Company C-2, Person A and Person B helped conceal Iranian connections through lies and omissions.

  c. Person A and Person B helped Person C open a new business account for Company C-2 so that Person C could continue conducting USD transactions, after SCB exited its banking relationship with Company C-1 in February 2011 based on numerous payment request rejections due to Iran sanctions concerns.

  d. Company C-1 and Company C-2 successfully conducted approximately 9,500 USD financial transactions through SCB from 2007-2011, while conspiring with Person A and Person B. These transactions involved the movement of approximately $240 million through the U.S. financial system.

**(Conspiracy to Violate IEEPA, in violation of Title 18, United States Code, Section 371)**

**<u>FORFEITURE ALLEGATION</u>**

  35. Upon conviction for the offenses alleged in Counts One and Two, Defendant SCB, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real and personal, that constitutes or is derived from proceeds traceable to the commission to the offense, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offense.

  36. If any of the above-described forfeitable property, as a result of any act or

omission of the defendant:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third party;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property that cannot be divided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), to seek forfeiture of any other property of the defendant up to the value of the forfeitable property described above.

**(Criminal Forfeiture, pursuant to Title 18, United States Code 981(a)(1)(c), Title 28, United States Code, Section 2461(c), and Title 21, United States Code, Section 853(p))**

JESSIE K. LIU
UNITED STATES ATTORNEY

ALESSIO D. EVANGELISTA
PRINCIPAL ASSISTANT UNITED STATES ATTORNEY

By: _____
Peter C. Lallas
New York Bar No. 4290623
Michael J. Friedman
New York Bar No. 4297461
Assistant United States Attorneys
555 4th Street, N.W.
Washington, D.C. 20530
(202) 252-6765 (Friedman)
(202) 252-6879 (Lallas)


BRIAN A. BENCZKOWSKI
ASSISTANT ATTORNEY GENERAL

DEBORAH L. CONNOR
CHIEF, MONEY LAUNDERNG
   AND ASSET RECOVERY SECTION

By: _____
Jennifer L. Wine
D.C. Bar No. 976005
Trial Attorney, Bank Integrity Unit
Money Laundering and Asset Recovery Section
1400 New York Ave., NW
Washington, DC 20005
(202) 616-2595